

**SIGNED this 12 day of February, 2024.**

_____

**John T. Laney, III**
**United States Bankruptcy Judge**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

| | | |
|---|---|---|
| In re: | * | Case No. 22-70600-JTL |
| Jerry Max Ward, Jr., | * | Chapter 7 |
| | * | |
| Debtor. | * | |

| | | |
|---|---|---|
| **Adversary Proceeding No. 22-07012-JTL** | * | **Adversary Proceeding No. 22-07013-JTL** |
| Katie Clay and Chris Clay, | * | Rachel Anderson and Daniel Anderson, |
| Plaintiffs, | * | Plaintiffs, |
| v. | * | v. |
| Jerry Max Ward, Jr., | * | Jerry Max Ward, Jr., |
| Defendant. | * | Defendant. |

| | | |
|---|---|---|
| **Adversary Proceeding No. 22-07014-JTL** | * | **Adversary Proceeding No. 22-07016-JTL** |
| Melissa Rineer and John Rineer, | * | Melissa Hardy and David Hardy, |
| Plaintiffs, | * | Plaintiffs, |
| v. | * | v. |
| Jerry Max Ward, Jr., | * | Jerry Max Ward, Jr., |
| Defendant. | * | Defendant. |

| | | |
|---|---|---|
| **Adversary Proceeding No. 22-07017-JTL** | * | **Adversary Proceeding No. 22-07018-JTL** |
| Melissa Dixon and Mark Dixon, | * | Christopher M. Davis and Rachel Davis, |
| Plaintiffs, | * | Plaintiffs, |
| v. | * | v. |
| Jerry Max Ward, Jr., | * | Jerry Max Ward, Jr., |
| Defendant. | * | Defendant |

1

<u>MEMORANDUM OPINION OF FINDINGS OF FACT
AND CONLUSIONS OF LAW</u>

The above-styled adversary proceeding was tried beginning on January 31, 2024. Chris and Katie Clay, represented by Mr. Christopher Rodd, Daniel and Rachel Anderson, John and Melissa Rineer, David and Melissa Hardy, Mark and Melissa Dixon, and Christopher and Rachel Davis, all represented by Mr. Richard Wilkes, objected to the discharge of their debts against Jerry Max Ward, Jr. represented by Mr. Thomas Lovett, under rules § 523(a)(2)(A) and § 523(a)(6).[1] The Court finds the Plaintiffs failed to meet their burdens of proof and finds the Plaintiffs' debts are dischargeable.

## I.    FACTUAL FINDINGS AND PROCEDURAL HISTORY

The twelve Plaintiffs represent six couples who entered contracts to build pools at their residences with Quality Pools & Patios, LLC, "Quality Pools." In June of 2022, Quality Pools failed without completing the Plaintiffs' pools. Mr. Jerry Max Ward, Jr., the Defendant, was the sole owner of Quality Companies and its subsidiary Quality Pools. Mr. Ward filed for bankruptcy on July 22, 2022.

### a.  Factual Findings about the Plaintiffs' Interactions with Mr. Ward and His Companies

The Court presents its factual findings in the individual adversary proceedings in the numerical order of their cases:

#### 1.  Chris and Katie Clay, 22-7012

---

[1] The adversary proceeding *Nathan and Pause Shiver v. Jerry Max Ward, Jr.*, 22-7015, was consolidated and set for trial at this time, but no evidence was presented on behalf of the Shivers.

Mr. and Mrs. Clay, together the "Clays," received Mr. Ward's contact information from a friend who had work performed by Mr. Ward at some point previously. Hr'g Held, Doc. 21. In October of 2021, Mr. Ward went to the Clays home and quoted them a price for their pool. *Id*. Shortly thereafter, the Clays signed a contract for a pool quoted at $74,110.00. Pl.'s Ex. 2. The form of their contract is the same as the contracts signed by the other Plaintiffs. It listed "Quality Pool & Patio" at the top, listed the business address 4609 Bemiss Rd, Valdosta, GA, 31605, and included a signature space for the Customer and "Quality Rep" which this Court infers to mean a representative of Quality Pools. *Id*. On October 20, 2021, the Clays obtained a cashier's check for $10,000.00 payable to "Quality Companies." Pl.'s Ex. 3. The Clays were aware at that point that pool construction would not begin immediately, but they were put on a list of upcoming projects of Quality Pools and their estimated completion date for the project was around August or September 2022. Hr'g Held, Doc. 21.

Around April 2022, the Clays began designing their pool with Mr. Allan Barr, an employee of Quality Pools. Hr'g Held, Doc. 21; Pl's Ex. 4. In May, the pre-permitting requirements were completed. Pl.'s Ex. 5. On May 31, a GA811 Locate Request was submitted for the Clays. *Id*. The Locate Request states that Ms. Linda Manning called in the request for Quality Companies, Inc. *Id*. Mr. Ward later testified Ms. Manning is the office manager at Quality Pools. Hr'g Held, Doc. 23.

In the beginning of June, the Clays received a letter signed by Max Ward. Pl.'s Ex. 7. The Plaintiffs all received the same letter. The header says, "Quality Pool & Patio" and again lists the business address as 4609 Bemiss Rd, Valdosta, GA, 31605. *Id*. The letter states that Quality Pools "made a commitment to [its clients] in regards [sic] to a price, timeline and a level of service that would be provided" and "it has become apparent that there will be no way for [the

3

company] to meet these initial commitments." The letter blamed "price increases on labor, fuel, and materials" stating "the current prices under contract no longer over the costs of the pool installation." At that point, the Clays requested their money back from Mr. Ward by June 23, 2022. Mr. Ward did not refund the Clays' deposit. Hr'g Held, Doc. 21. On July 11, 2022, the Clays initiated a breach of contract claim against Mr. Ward personally in the Magistrate Court of Thomas County. Pl.'s Ex. 8.

After Mr. Ward's bankruptcy was filed, the Clays initiated their adversary proceeding on December 15, 2022.

**2.   Daniel and Rachel Anderson, 22-7013**

In October of 2020, Mr. Ken Perry, an employee of Quality Pools met with Dr. and Mr. Anderson, together the "Andersons," to discuss constructing a pool in their backyard. Def.'s Ex. D-1. On October 8, 2020, Mr. Anderson signed the Quality Pools form contract with their specific pool quoted at $43,820.00 Def's Ex. D-2. Mr. Perry signed the line for "Quality Rep." *Id*. The Andersons paid an initial deposit of $13,146.00. Def's Ex. D-1.  The Andersons were aware at that point that construction would not begin immediately, but they were on a list of the company's upcoming projects. Hr'g Held, Doc. 22. In March 2021, the Andersons modified their contract and the price of their pool increased to $81,325.00. Def.'s Ex. D-1.

In October 2021, Quality Pools began work at the Andersons' home and the Andersons paid the next contract installment of $39,000.00. Def.'s Ex. D-1. The original pool site had an issue with the septic line and worked stopped at their home. *Id*. After the Andersons moved the septic line and moved the placement of their pool, they worked with Quality Pools to redesign their pool to accommodate the new space. Hr'g Held, Doc. 22. Quality Pools obtained new permits and began work in January 2022. Def's Ex. D-1. In April 2022, rebar and frame forms

were installed to prepare for the installation of shotcrete. Def.'s Ex. D-1. On May 18, 2022,

shotcrete was poured into the pool shell. *Id*. Underground plumbing was also installed. Hr'g

Held, Doc. 22. Quality Pools did no other work on the Andersons' pool. *Id*. Dr. Anderson

testified that she calculated that Quality Pools had done approximately $35,000.00 worth of work

and she had paid approximately $52,000.00 to the company at that point. *Id*. Dr. Anderson also

testified that it cost the Andersons $26,000.00 to complete the pool and added that there were

$7,505 worth of "issues that needed to be fixed" before it could be finished. *Id*. The testimony

was unclear as to whether the $26,000.00 included the $7,505.00 of repairs.

After Mr. Ward declared bankruptcy, the Andersons initiated their adversary proceeding

on December 16, 2022.

### 3. John and Melissa Rineer, 22-7014.

Mr. and Mrs. Rineer, together the "Rineers," chose to work again with Mr. Ward after he

successfully completed a patio project for them in 2018. Hr'g Held, Doc. 22. On April 15, 2022,

Mr. Ward met with the Rineers and quoted the pool they wanted would cost $40,580.00. Def.'s

Ex. D-8. Mr. Ward told the Rineers that he had a list of upcoming projects that would precede

their job at which point Mrs. Rineer asked if paying the full contract price would "move [them]

up on the list." Hr'g Held, Doc 22. Mr. Ward affirmed that paying the full price would expedite

the timeline of the project and the Rineers gave Mr. Ward a check made out to "Quality

Companies" for $40,580.00. *Id*.; Def.' Ex. D-13. Mr. Ward said he could begin work in six to

eight weeks. Hr'g Held, Doc 22. The Rineers prepared their yard by paying a landscaping

company $3,000 to take down a fence and move some hedges. *Id*. Pl.'s Ex. P-2.

On May 20, 2022, "Quality Company" requested and was issued zoning approval from

Lowndes County for the Rineers' property. Def.'s Ex. D-8. On May 23, 2022, a Lowndes County

building permit was issued to "Quality Pools" for the Rineers' property. *Id*. Also on May 23,

2022, Quality Pools received an "LC-Res Accessory Structure Permit" for the Rineers' property.

*Id*. On May 31, 2022, Ms. Manning called and submitted an GA811 Locate Request for Quality

Companies, Inc. at the Rineers' address. *Id*.

On July 4, 2022, the pool site was excavated at the Rineers' property. Def.'s Ex. D-1. No

other progress was made towards building a pool. Hr'g Held, Doc. 22. The Rineers repeatedly

attempted to contact Mr. Ward to continue the work on their pool. *Id*. Finally, Mr. Ward spoke to

the Rineers and stated he would not be completing their job, he was declaring bankruptcy, and he

did not have their money to return. *Id*. At some later date, an employee of Quality Pools returned

to the Rineers' home and pushed the dirt back into the hole excavated by Quality Pools. *Id*. The

pushed in dirt eventually sunk in because it was not properly packed. Shortly after this

experience, the Rineers decided to sell their home and leave Valdosta. *Id*. To sell their home, the

Rineers had to pay a landscaper $500.00 to repair their lawn. *Id*.

After Mr. Ward declared bankruptcy, the Rineers initiated their adversary proceeding on

December 16, 2022.

### 4. David and Melissa Hardy, 22-7016

Mrs. Hardy and her husband, together the "Hardys" moved to Valdosta at the end of

2020. When she was touring homes in Valdosta, Mrs. Hardy noticed two neighboring houses of

one of the homes she was interested in were getting pools installed. Hr'g Held, Doc. 21. She

asked an employee of the company, Mr. Perry, what it would cost to have a pool installed at the

home in which she was interested. *Id*. In March 2022, Mrs. Hardy contacted Mr. Ward after

being referred to his business by friends and neighbors. *Id*. Mr. Ward met with Mrs. Hardy at her

home to discuss potential plans. *Id*. On March 4, 2022, Mrs. Hardy signed the contract which

listed the contract price as $79,945.00. Def.'s Ex. D-7. Mrs. Hardy wrote a check to Quality Companies for $24,000.00. *Id*. Mrs. Hardy stated that she had a surveyor come out to mark the property lines which was an additional expense to prepare for the pool's construction. *Id*. In June 2022, the Hardys received the letter signed by Mr. Ward stating that the company was facing difficulty. *Id*. No designs were created, nor construction ever begun on the Hardys' property.

After Mr. Ward declared bankruptcy, the Hardys initiated their adversary proceeding on December 16, 2022.

### 5.   Mark and Melissa Dixon, 22-7017

Mr. and Mrs. Dixon, together the "Dixons," met with Mr. Ward in January 2022. Hr'g Held, Doc. 22. They chose to work with Mr. Ward because he said they would have their pool complete around June or July of that year. *Id*. Their contract states that their pool would cost $62,520.00. Def.'s Ex. D-4. On January 18, 2022, Mrs. Dixon signed the contract, and the Dixons wrote a check for $15,000.00. Hr'g Held, Doc. 22. After creating a design, submitting permits, submitting zoning approvals, and purchasing the permits for the construction, Quality Pools began work at the Dixons' home on May 23, 2022. Def.'s Ex. D-1. At the time of excavation, the Dixons paid an additional $22,500.00. *Id*. During late May and early June, Quality Pools installed wood forms and rebar, installed shotcrete, and installed and pressure tested the pool's plumbing system. *Id*. No other work was completed by Quality Pools for the Dixons. Hr'g Held, Doc. 22. To complete their pool, Mr. Dixon averred they needed to spend approximately $46,000.00. *Id*. A lien was also placed on their house for the concrete poured for $5,246.40 which the Dixons paid to release. *Id*.

After Mr. Ward declared bankruptcy, the Dixons initiated their adversary proceeding on December 16, 2022.

### 6.   Christopher and Rachel Davis

Mr. and Mrs. Davis, together the "Davises," received a referral to work with Quality

Companies and Mr. Ward from a friend. Hr'g Held, Doc. 23. Mr. Davis said he initially met with

Mr. Perry to create initial drawings and sign the contract and then worked with Mr. Barr to create

a design. *Id*. Mr. Ward, he averred, was the third employee of Quality Pools with whom he

worked. *Id*. On August 6, 2021, the Davises signed the contract with Mr. Perry and submitted

their deposit of $30,000.00. Def's Ex. D-1. The contract price for their pool construction was

$129,488.00. Def's Ex. D-4. Construction was estimated to begin on their project in January

2022 and finished around April 2022 in time for the Davis's son's high school graduation party.

Hr'g Held, Doc. 23.

In December 2021, Mr. Ward went to the Davises' house and outlined the pool shape in

their backyard. *Id*. On December 27, 2021, the Davises wrote a check for $48,000.00 to begin

excavation. Def.'s Ex. D-1. On December 28, 2021, a GA811 Locate request was submitted for

the Davises' property. *Id*. On December 29, 2021, the pool site was excavated, and the dirt was

removed. *Id*.

In January 2022, the pool forms were framed, and rebar installed to prepare for shotcrete

installation. *Id*. According to Mr. Davis, the company was showing up "quite regularly" to work

on their project. Hr'g Held, Doc. 23. In February, pool swim jet outlets and a skimmer were

installed, and shotcrete was installed creating a pool shell. Def.'s Ex. D-1. In March, the

backyard was leveled and graded for decking and the pool plumbing and lights were installed. *Id*.

In April, the city inspector approved the plumbing and electrical systems, and a conduit was

installed for drainage and electrical and gas lines. *Id*. On April 30, 2022, the Davises paid Quality

Pools $25,000.00. *Id*. In May, dirt was delivered to level the area of the deck for installation and

frame forms were installed to prepare the for the RV pad concrete. *Id*. Later that month, the RV pad was poured, pool coping stone installation began, framing and rebar was installed for pool decking, and the decking was poured. *Id*.

On May 23, 2022, Mr. Ward met with the Davises to discuss the pool party. Def.'s Ex. D-1. While the pool was incomplete for the party, the Davises were able to fill the pool with water and swim in it at the party. *Id*. Mr. Ward also delivered and placed pine straw for the party at no charge. *Id*. On June 12, the Davises drained the pool so the waterfall could be installed. *Id*. No other work was performed on their pool by Quality Pools. Hr'g Held, Doc. 23.

On June 15, 2022, the Davises received the letter signed by Mr. Ward about the financial troubles of the company. Def.'s Ex. D-9. On June 21, 2022, Mr. Ward met with the Davises. Hr'g Held, Doc. 23. The Davises asked Mr. Ward where the money that they had paid him had gone and he responded that he was spread too thin and was working too many projects to meet the pandemic increase in demand. *Id*. Mr. Ward asked for an additional payment at that point that the Davises did not remit. *Id*.

The Davises did most of the work themselves to finish the pool but had to contract with other companies to install the marcite and install the pool equipment. Hr'g Held, Doc. 23. On August 8, 2022, Mr. Davis was working on the largest water feature in their pool and fell, shattering both of his heel bones. *Id*. He had reconstruction surgery on August 17, 2022, and was unable to walk until November of that year. *Id*. He testified he still suffers from pain. *Id*.

To finish the work for which the Davises contracted with Quality Pools, the Davises paid $53,786.00 which does not include labor costs because they did most of the labor themselves. Hr'g Held, Doc. 23. The Davises also paid $4,967.00 to remove liens on their house for materials that Quality Pools had used for their pool. *Id*.

After Mr. Ward declared bankruptcy, the Davises initiated their adversary proceeding on December 16, 2022.

### b.  Factual Findings about Mr. Ward and His Companies

Mr. Ward opened Quality Companies, Inc. about thirty years ago and opened Quality Pools, its subsidiary, in 2003. Hr'g Held, Doc. 23. He is the sole owner of Quality Companies which wholly owns Quality Pools. *Id*. Mr. Ward testified that Quality Pools had approximately thirty employees at the time of closing the business including Ms. Linda Manning who served as the office manager and bookkeeper, Mr. Allan Barr who was a project manager and pool designer, and Mr. Ken Perry who was a salesperson for the company. *Id*. The company also employed different work crews involved in the stages of pool construction. *Id*. Ms. Manning tracked the moneys in and out and used to do payroll but, as Quality Pools grew, the company switched to using ADP, a payroll service. *Id*.  Mr. Ward testified that there were multiple corporate accounts with Quality Companies or Quality Pools listed as the owners including a payroll account, a payroll tax account, and two operating accounts. *Id*. The companies filed consolidated corporate tax returns and maintained various insurance policies in the names of the companies. *Id*. Mr. Ward stated that the company was located at the address listed on the company's form contract for thirty years. *Id*.

Mr. Ward testified that the COVID-19 pandemic substantially affected his business. Hr'g Held, Doc. 23. First, the demand for home pools increased. *Id*. To attempt to capitalize on the demand, Mr. Ward purchased more machinery and equipment and hired more staff. *Id*. Simultaneously, material costs substantially increased. *Id*. For example, Mr. Ward said concrete increased roughly 30% and plumbing materials increased 400%. *Id*. Finally, labor prices increased. *Id*. Labor prices increased generally, and Mr. Ward's employees were working longer

hours or on weekends to satisfy their open orders which required him to pay time and half or
overtime for those employees. *Id*. Mr. Ward testified he had not adjusted his pool contract prices
to reflect these increased expenses and he was unaware that his company was losing money until
it could no longer pay its bills. *Id*. Mr. Eric Tillman, the companies' accountant, stated that Mr.
Ward was losing money with every pool he built. Hr'g Held, Doc. 24.

Mr. Ward stated he realized his company was in financial distress in June 2022. Hr'g
Held, Doc. 23. He had taken out merchant cash advances, corporate high interest loans, and the
money was added to his operating accounts. Hr'g Held, Doc. 24. Still, the company was
absorbing the increased prices and losing money. *Id*. Mr. Ward testified he approached Farmers
& Merchants Bank for a loan for $550,000.00. *Id*. He worked with Mr. Tillman to draft a budget
that he could present to the bank for proof of his companies' future profitability. *Id*. Included was
a line item for "Estimated Cost to Complete Current WIP" which was identified to mean the
current "work in progress" or projects under contract. *Id*.; Def.'s Ex. D-11.  The initial budget
presented listed those projects as able to be completed in six months. Def.'s Ex. D-11. Farmers &
Merchants Bank denied Mr. Ward's request for a loan. Hr'g Held, Doc. 24. On June 22, 2022,
Mr. Ward returned to the bank asking for a $250,000.00 loan. *Id*. In the budget prepared for that
meeting, the work in progress projects were stretched out to be completed over 12 months. Def.'s
Ex. D-11. Farmers & Merchants Bank denied that loan request as well. Hr'g Held, Doc. 24. On
June 30, 2022, Farmers & Merchants Bank froze Quality Companies and Quality Pools bank
accounts with their bank. *Id*.  Quality Companies and Quality Pools also had bank accounts with
Synovus, but Mr. Ward testified that these did not have enough money to continue operating. *Id*.

Mr. Ward filed for bankruptcy on July 22, 2022. On his schedules, Mr. Ward listed the

Plaintiffs as creditors. *Jerry Max Ward, Jr.*, 22-70600, Def.'s Pet. and Schedules, Doc. 1. He

listed their claims as "contingent, unliquidated, and disputed." *Id.*

## II.   LEGAL ANALYSIS

The Plaintiffs brought their actions under both § 523(a)(2)(A) and § 523(a)(6) of the

Bankruptcy Code. No argument was made by the parties as to § 523(a)(6) so the Court focuses

its analysis on § 523(a)(2)(A). This Court finds Mr. Ward does not personally owe a debt to the

Plaintiffs and that, even if he did, the Plaintiffs failed to prove the elements required by §

523(a)(2)(A) to except their debts from Mr. Ward's discharge.

### a.   Mr. Ward is not personally liable for his companies' debts.

The Plaintiffs failed to pierce the corporate veil as to hold Mr. Ward personally liable for

the debts of his company. "A basic tenet of American corporate law is that the corporation and its

shareholders are distinct entities." *Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2003) *see

also* (*U.S. v. Fid. Capital Corp.*, 920 F.2d 827, 836 (11th Cir. 1991)) ("Under Georgia law, a

corporation and its shareholders and officers are separate, even if one person owns all of its

shares and controls its actions.") The legal separation between a corporation and shareholders

has been called the "corporate veil," which shields its shareholders from the corporation's

liabilities. This protection can be set aside, however, if the Court finds that an individual

shareholder has "us[ed] the corporate form to defeat justice, perpetuate fraud, promote crime,

evade contractual or tort responsibility, or for any other reason which in equity or good

conscience would justify the disregard of the corporate entity." *Fidelity Capital Corp.*, 920 F.2d

at 836-37. To pierce the corporate veil, the complaining party must not only show that some

injustice occurred, but that the shareholder has wrongfully used the corporate form to perpetuate

that harm. In this case, there is no evidence that Mr. Ward abused the corporate forms of Quality Companies and Quality Pools to perpetuate harm to the Plaintiffs.

The Plaintiffs' complaints never allege that Mr. Ward abused the corporate forms of Quality Companies and Quality Pools. The Plaintiffs also did not present any evidence that Mr. Ward abused the corporate form to perpetuate the alleged fraud against the Plaintiffs. The Court interprets some of the Plaintiffs' remarks as allegations that Mr. Ward used the Quality Companies and Quality Pools as his "alter ego." For example, Mr. Clay agreed with the premise that "it appear[ed] that [he] was making a deal with Mr. Ward by and through the company [Mr. Ward] had" Hr'g Held, Doc. 21.

The alter ego theory allows the Court to pierce the corporate veil if it is shown that "the corporate entity is the alter ego or business conduit of its owner." *Fidelity Capital Corp.,* 920 at 837. To succeed on this theory, the Plaintiffs must show "the shareholders disregarded the corporate entity and made it a mere instrumentality for the transaction of their own affairs, that the corporation and its owners have such unity of interest and ownership that they lack separate personalities, and that to observe the corporate form would work an injustice or promote fraud." *Id*. (*citing Maley v. Carroll*, 381 F.2d 147, 153 (5th Cir.1967)). "The mere fact that a person owns and controls a corporation will not justify a finding of abuse of the corporate entity." *Id*. "The plaintiff must show the owner abused the corporate form by disregarding the separateness of legal entities by commingling on an interchangeable or joint basis or confusing the otherwise separate properties, records, or controls." *Scott Bros. v. Warren*, 582 S.E.2d 224, 227 (Ga. App. 2003). In this case, the Plaintiffs did not meet their burden to show that Mr. Ward used Quality Companies and Quality Pools as his alter ego to conduct business.

13

Quality Companies and Quality Pools filed their own consolidated tax returns, maintained balance sheets and other corporate accounting records, and had their own bank accounts separate from Mr. Ward. The Plaintiffs' checks were written to "Quality Companies," "Quality Pool & Patio," or "Quality Pools," not to Mr. Ward himself. Def.'s Ex. D-12; Def.'s Ex. D-13; Def.'s Ex. D-14; Def.'s Ex. D-15. The companies maintained their own business address not at Mr. Ward's personal address, used form contracts with the name of the company on the header, and had many employees other than Mr. Ward. *Contra Fidelity Capital Corp.*, 920 F.2d at 839 (using evidence of a lack separate office space, stationary, and employees as evidence to pierce the corporate veil). Mr. Ward sometimes did not interact with the Plaintiffs until after the contract was signed and initial deposit remitted demonstrating that Quality Pools contracted with the Plaintiffs separately from Mr. Ward himself. The evidence does not show that Mr. Ward was using Quality Companies and Quality Pools as a corporate conduit to personally contract with individuals to build pools.[2]

The Plaintiffs seem to also allege that Mr. Ward siphoned funds from Quality Companies and Quality Pools for his own use. Evidence that the owner used corporate funds for personal expenses may support a finding that the Court should pierce the corporate veil. *Scott Bros. v. Warren*, 582 S.E.2d 224, 227 (Ga. App. 2003). The Plaintiffs presented that Quality Companies lists large expenditures under "Shareholder Distributions" in 2020, 2021, and 2022 and claimed Mr. Ward was taking money from the company other than his salary as a. Def.'s Ex. D-11. Mr. Ward testified that the company reimbursed him for cash payments he made to laborers and vendors and those reimbursements were listed under "Shareholder Distributions." Hr'g Held,

---

[2] The separation between Quality Companies and Quality Pools may be a legal fiction demonstrated by the joint ownership of many of these records and controls. The Court did not expend effort to determine which accounts, records, property etc. were owned by which company as such division is irrelevant to the case. The Court only determined there was not a lack of separateness from Mr. Ward's personal assets, records, property, etc.

Doc. 25. The Plaintiffs did not present any evidence that that money was used to pay Mr. Ward's personal expenses or any evidence that would contradict Mr. Ward's testimony. The Plaintiffs did not meet their burden to demonstrate that Mr. Ward was inappropriately using corporate funds for his own use.

The Plaintiffs signed contracts with Quality Pools to build their pools. The Plaintiffs did not present evidence that Mr. Ward used his companies as business conduits for his own personal transactions, nor did the Plaintiffs present evidence that Mr. Ward used corporate funds for his own use. Mr. Ward, therefore, cannot be held personally liable for the debts of Quality Pools. Instead, the evidence demonstrates that Mr. Ward maintained the corporate formalities which separate him from the corporations he owns and shield him from personal liability for the corporations' actions. The Plaintiffs, therefore, cannot recover from Mr. Ward personally for debts owed to them by the corporations.

### b. The Plaintiffs did not meet their burden of proof as to § 523(a)(2)(A)

The Plaintiffs argue that, assuming the corporate veil was pierced and Mr. Ward could be held personally liable for the Plaintiffs' claims, their claims against Mr. Ward should be found nondischargable under § 523(a)(2)(A). Section 523(a)(2)(A) excepts from discharge debts "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud." The Plaintiffs argue that Mr. Ward's representations that he would build pools for the Plaintiffs were false and, thus, their debts should be excepted from Mr. Ward's discharge. The Court finds, even if Mr. Ward could be found personally liable for the debts of his company, the Plaintiffs did not meet their burden as to nondischargablity.

Statutory exceptions to discharge are construed "liberally in favor of the debtor."

*In re Miller*, 39 F.3d 301, 304 (11th Cir. 1994). The Court looks at the totality of the circumstances even when the debtor denies wrongdoing. *In re Ettus*, 596 B.R. 405, 412 (Bankr. S.D. Fla. 2018). However, "if there is room for an inference of honest intent, the question of nondischargeability must be resolved in the debtor's favor." *In re Burnley*, 574 B.R. 905, 917 (Bankr. N.D. Ga. 2017).

The Plaintiffs claim that Mr. Ward made false representations to them by promising to build their pools and failing to do so. To prevail on a false representation claim under § 523(a)(2)(A), the Plaintiffs must show, "(1) the debtor made a false representation with the intention of deceiving the creditor; (2) the creditor relied on the false representation; (3) the reliance was justified; and (4) the creditor sustained a loss as a result of the false representation." *In re Wood*, 245 Fed. Appx. 916, 917–18 (11th Cir. 2007) (unpublished) (citing *In re Bilzerian*, 153 F.3d 1278, 1281 (11th Cir. 1998)). The Defendant does not dispute elements two, three, and four, so the only element at issue in this case is whether Mr. Ward made the representations that he would build the Plaintiffs' pools with the intent to deceive them into remitting payment. This Court finds the evidence does not demonstrate that Mr. Ward had fraudulent intent at the time he contracted with the Plaintiffs or received payments from them.

The Plaintiffs argue the mere fact that they were promised pools and Mr. Ward did not build their pools demonstrates that he made a false misrepresentation. This is not the legal standard under § 523(a)(2)(A). The standard is whether Mr. Ward intended, when the Plaintiffs signed their contracts, paid their deposits, or made any other payments towards their pool contracts, to in fact build the Plaintiffs' pools. *See Matter of Hilsman*, 576 B.R. 717, 726 (Bankr. M.D. Ga. 2017). The evidence does not demonstrate that Mr. Ward did not actually intend to build the pools when he made the promises to the Plaintiffs or when he received additional

16

contractual payments from them. The evidence instead supports the finding that Mr. Ward took

steps in many of the cases to fill his contractual promises, but the rising cost of pool supplies

eventually caused Quality Pools to fail.

In only one of the cases, the case of the Hardys, was no work at all done in the fulfillment

of their contract. The Hardys' contract was signed in March 2022 and Quality Pools failed before

construction was scheduled to begin at their home. Def.'s Ex. D-1. No evidence was presented

that Mr. Ward did not, at the time he met with Mrs. Hardy, intend to build the Hardys' pool.

Furthermore, in the other cases, there were clear steps taken by Mr. Ward that support a finding

that he intended to fulfill his contractual obligations. The Clays signed their contract in October

2021, but work did not begin for their pool until April and May 2022 when designs were

finalized, and permits were pulled. Pl.'s Ex. 1. The Andersons contracted with Quality Pools in

October 2020, and they had substantial work completed at their home. The Andersons had an

initial plan that was changed which delayed their progress until January 2022. Def.'s Ex. D-1.

Mr. Ward estimated that he completed fifty percent of their pool. Hr'g Held, Doc. 24. Work

stopped at the Anderson's home in late May or early June 2022. Def.'s Ex. D-1. The Rineers had

the last contract signed in these cases with Quality Pools in April 2022. *Id*. Permits were pulled

and excavation began before work stopped at their home in July 2022. *Id*. The Dixons entered

into their contract with Quality Pools in January of 2022. *Id*. Mr. Ward estimated that he

completed somewhere between fifty to sixty percent of their pool until work stopped at their

home in late May or early June 2022. Hr'g Held, Doc. 24. The Davises signed their contract with

Quality Pools in August 2021. Def.'s Ex. D-1. Mr. Ward estimated he completed seventy percent

of their pool, and the Davises were even able to swim in their pool at one point while Mr. Ward

was still working at their home. Hr'g Held, Doc. 24; Def.'s Ex. D-1. Work stopped at their home

sometime between May and June 2022. Def.'s Ex. D-1.

The Plaintiffs did not dispute the work Mr. Ward's company did on their individual

projects including designing the pools, pulling permits, beginning excavation, installing rebar

and shotcrete, and installing underwater plumbing. The Plaintiffs also did not dispute Mr. Ward's

estimates that many of their pools were over halfway completed. The Plaintiffs engaged Quality

Pools at different times between late 2020 and spring of 2022, but the work stopped at their

homes almost simultaneously around June 2022 when Mr. Ward averred his companies'

financial difficulties were becoming apparent. Moreover, when Mr. Ward was seeking financing

from Farmers & Merchants Bank to save his company in mid- to late June, the evidence

demonstrates it was still his intent to finish the work he had currently under contract. The

budgets prepared for Mr. Ward's meetings with the bank included the "Estimated Cost to

Complete Current WIP" which was identified as the cost of completion for Quality Pools work

in progress. Hr'g Held, Doc. 24; Def's Ex. D-11. Mr. Ward testified that that line item included

the six Plaintiffs' projects. *Id*.

The evidence shows that, at the time he contracted with the Plaintiffs, often many months

and even years before Mr. Ward averred that he realized his company was in serious financial

distress, and at all times when he received money from the Plaintiffs, Mr. Ward intended to

complete the Plaintiffs pools. The Court understands the Plaintiffs' unhappiness about their

situation. Mr. Ward promised to build the Plaintiffs' pools and did not deliver. Unfortunately for

the Plaintiffs, a breach of contract or broken promise is insufficient to support a finding of

nondischargablity.

> The failure to perform a mere promise is not sufficient to make a debt nondischargeable,
> even if there is no excuse for the subsequent breach. A debtor's statement of future

18

> intention is not necessarily a misrepresentation if intervening events cause the debtor's
> future actions to deviate from previously expressed intentions…. This intent may be
> inferred from the fact that the debtor failed to take any steps to perform under the
> contract.

4 Collier on Bankruptcy ¶ 523.08 (16th 2023). Under this framework, the evidence supports Mr.

Ward's testimony that he intended to finish the pools when his company entered into contracts

with the Plaintiff and received their deposits and later payments. Mr. Ward took many steps to

complete the Plaintiffs' pool projects, some of which were over half completed at the time work

stopped at their house. The evidence demonstrates that the increased costs for labor and materials

prevented Mr. Ward from completing his contractual obligations which is insufficient for a

finding of nondischargablity under § 523(a)(2)(A).

The Plaintiffs for whom Quality Pools completed some work argued that the value of the

work they received was not worth the amount of money that they had given to Mr. Ward. For

example, Dr. Anderson testified that she estimated the value of the work done on their pool was

approximately $35,000.00, but they had paid Quality Pools $52,000.00. Hr'g Held, Doc. 22. The

Dixons and the Davises had similar complaints, and Mrs. Rineer stated that the work that Quality

Pools did at their home in fact had a negative value because she had to pay to repair her yard.

Hr'g Held, Doc. 22; Hr'g Held, Doc. 23. Unfortunately for the Plaintiffs, this evidence of partial

performance undermines their claim under § 523(a)(2)(A). The question under § 523(a)(2)(A) is

not whether the Plaintiffs were injured in some way by Mr. Ward's conduct, but whether Mr.

Ward had any intention to perform their contract upon incurring their debt. Partial performance

of the contract has often supported courts' findings that § 523(a)(2)(A) does not apply. *See e.g.*

*In re Mills,* 345 B.R. 598, 605 (Bankr. N.D. Ohio 2006) (finding "of great significance" that a

debtor completed sixty percent of his contractual obligations in determining that the debtor did

not make fraudulent misrepresentations of his intent to perform). The estimated value of the

work received, while negative or less than the deposits paid to his company, supports Mr. Ward's claim that he intended to perform his contractual obligations.

The Plaintiffs also argued that Mr. Ward made false representations as to the financial condition of his company. For example, the Clays argued that they would not have worked with Mr. Ward if they had known about the financial status of his company when they signed their contract and paid the deposit. Hr'g Held, Doc. 21. No evidence was presented on behalf of any of the Plaintiffs, however, that they asked Mr. Ward about his financial status or that he made any representations about the finances of his company. The nondisclosure of a debtor's financial status is not a false representation for purposes of § 523(a)(2)(A). *In re Hunter*, 780 F.2d 1577, 1580 (11th Cir.1986), *abrogated on other grounds by Grogan v. Garner,* 498 U.S. 279 (1991)). Therefore, without evidence of actual false representations by Mr. Ward about the financial status of his companies, the Plaintiffs' argument cannot succeed.

Finally, many of the Plaintiffs argued they had additional monetary damages beyond the deposits and other money given to Quality Pools. This includes but is not limited to the cost for some Plaintiffs to complete their pools, the money paid by the Rineers and the Hardys to prepare their property to install the pool and later by the Rineers to fix their yard to sell their home, and money paid by the Dixons and the Davises to remove liens on their homes. Hr'g Held, Doc. 21; Hr'g Held, Doc. 22; Hr'g Held, Doc. 23. While the Court acknowledges these unfortunate additional expenses paid by the Plaintiffs, section 523(a)(2)(A) does not support a finding of nondischargablity solely upon the evidence of financial injury without the requisite finding of fraud. The Plaintiffs did not meet their burden under the statute, and thus, their debts cannot be found nondischargable.

**III.    CONCLUSION**

For the reasons stated, the Court finds that the Plaintiffs did not meet the burden of proof required to pierce the corporate veil, nor to support a finding of nondischargablity under § 523(a)(2)(A). The Court will enter an order accordingly.

END OF DOCUMENT